**Kimberly Kay KRUSEMARK, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

**No. 4:09–cv–347 RP–TJS.**

United States District Court, S.D. Iowa, Central Division.

July 20, 2010.

Richard L. Richards, U.S. Attorneys Office, Des Moines, IA, for Defendant.

Timothy N. Tripp, Tripp, P.C., Pella, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiff, Kimberly Kay Krusemark, filed a Complaint in this Court on September 4, 2009, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed her applications for benefits on February 28, 2006. Tr. at 96–102. Plaintiff, whose date of birth is January 28,

1957 (Tr. at 96), was 51 years old at the time of the hearing. Tr. at 28. Plaintiff appeared at a hearing on October 28, 2008 before Administrative Law Judge Debra Bice (ALJ). Tr. at 20–50. The ALJ issued a Notice Of Decision—Unfavorable on January 22, 2009. Tr. at 9–19. The Appeals Council declined to review the ALJ's decision on July 6, 2009. Tr. at 1–3. Thereafter, Plaintiff commenced this action.

At the first step of the sequential evaluation, the ALJ found Plaintiff has not engaged in substantial gainful activity since February 1, 2006, the alleged onset of disability. At the second step, the ALJ found Plaintiff's severe impairments to be degenerative disc disease of the lumbar and cervical spine, bilateral carpal tunnel syndrome, headaches, and arthritis. The ALJ found that none of these impairments meet or equal a listed impairment which would qualify Plaintiff for benefits at the third step of the sequential evaluation. Tr. at 14. At the fourth step, the ALJ found Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that she cannot be exposed to cold environments, nor be required to work around vibrations. Tr. at 15. The ALJ stopped the sequential evaluation at the fourth step, finding that Plaintiff is able to return to her past relevant work as a housekeeper and a plastic-press molder. Tr. at 18. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 19.

## MEDICAL EVIDENCE & HEARING TESTIMONY

On January 12, 2006, Plaintiff was seen by David G. Mulder, D.O. at the University of Iowa Hospitals and Clinics. Plaintiff complained of pain in her right shoulder, radial aspect of the forearm into the hand, and in the medial aspect of the elbow. She also reported a change of color in the fingers of her right hand when exposed to cold. An EMG showed mild bilateral carpal tunnel syndrome and right C8 through T1 radiculopathy. On physical examination there was tenderness diffusely over the sacroiliac junction on both sides. Tr. at 253. Dr. Mulder's impression was: right C8 through T1 radiculopathy, ongoing tobacco use, bilateral carpal tunnel syndrome, traumatic arthritis and health maintenance issues. He ordered an MRI of the cervical spine, x-rays of the lumbar spine, and referred Plaintiff to Neurosurgery. She was given a prescription for hydrocodone. Tr. at 254.

On April 13, 2006, an MRI showed multi-level cervical spine degenerative disk disease, most severe at C5–6. Tr. at 258. Degenerative disk changes were seen from C3 through C7. Tr. at 261. X-rays of the lumbar spine showed degenerative disease of the lumbar spine with anterior osteophytes and articular facet sclerosis at L4, L5, and S1. The x-rays also showed decreased intervertebral disk height at L4–5. Tr. at 259. In the thoracic spine degenerative disk changes were seen with small anterior and lateral marginal vertebral body osteophytes. Tr. at 260.

Plaintiff saw Dr. Mulder on April 13, 2006. She reported a new onset of sharp right hip pain, particularly worse when laying in bed on that side. She complained of left knee pain and pain in both thighs. She said she felt stinging across the shoulders. She noted improvement in the right elbow pain. Plaintiff became tearful when telling the doctor about an incident when she woke up in the middle of the night with both of her arms "insensate." Although it improved quickly after she sat up, she was alarmed because her brother is a quadriplegic. On physical examination, Dr. Mulder noted Plaintiff's

tearful affect and odor of tobacco. Musculosketal examination showed obvious enlarged joints of the hand consistent with osteoarthritis. The right greater trochanteric area was exquisitely tender. The doctor noted the significant abnormalities on the MRI and x-rays. Tr. at 262. Plaintiff was given an injection of pain medication into the right greater trochanteric bursal area and she reported immediate relief. Tr. at 263.

On May 16, 2006, Plaintiff saw Matthew A. Howard, III, M.D. at the University of Iowa. Plaintiff repeated her history of pain for the doctor. On physical examination, Plaintiff was tearful and appeared to be in pain. The neck was diffusely tender to palpation and the range of motion was decreased in extension. The low back was non-tender and range of motion was normal in the lumbar spine. The doctor reviewed the MRI and EMG studies and noted they were inconsistent, but did not specify the inconsistencies. Dr. Howard opined that Plaintiff did not have pathology which would respond to surgery. Rather, he made arrangements for her to be evaluated in the pain clinic. Tr. at 265.

On August 2, 2006, Plaintiff was seen for a disability history and physical by Stephen M. Mineart, M.D. Dr. Mineart noted that Plaintiff was being seen at the University of Iowa, but there is no reference to the records therefrom, the radiological reports or the opinions and observations of the doctors at the University. Plaintiff recited her history, and told the doctor of her difficulty doing housework such as food preparation because of pain and tingling in her hands. Tr. at 267. After his physical examination, the doctor opined that Plaintiff would be able to work if lifting were limited to 20 pounds every 15–20 minutes, and walking were limited to 200 feet hourly. The doctor stated Plaintiff would be unable to work where repetitive lifting or repetitive motions of the hands was necessary. He also wrote that Plaintiff would have some difficulties with fumes, extremes of temperature, humidity, or other respiratory irritants. Tr. at 268.

On August 4, 2006, Plaintiff saw Arthur L. Doenecke, M.D. in primary care at the University of Iowa. Plaintiff reported that the pain in her neck is constant and unremitting. The doctor observed that she carried her head at an unusual angle because of the pain. Plaintiff reported partial relief from the hydrocodone which was prescribed, but she was not taking any anti-inflammatory medications. On physical examination, Plaintiff was described as a 49–year-old female in some distress, holding her head at an unusual angle as a splinting mechanism because of pain. Examination of the cervical spine showed tenderness and spasm of the paravertebral muscles of the cervical spine and trapezius muscles. The doctor observed that any movement of Plaintiff's C-spine caused extreme pain. Examination of the right hip joint showed point tenderness over the trochanteric bursa. Tr. at 286. Dr. Doenecke advised Plaintiff to take hydrocodone only for the worst pain. He gave Plaintiff prescriptions for Indocin and for a cervical collar, and advised her to use a heating pad and hot showers. Tr. at 287.

On September 19, 2006, Plaintiff saw Dr. Howard. The doctor noted that an lumbosacral MRI (see Tr. at 288) showed disc bulging at multiple levels, including a disc at right L4–L5. The doctor stated he wanted to get a right leg EMG and nerve conduction studies to clarify the diagnosis. Tr. at 284.

On February 27, 2007, Plaintiff saw Venkateswar R. Karuparthy, M.D. at the University of Iowa at the request of Dr. Mulder with a chief complaint of chronic neck and back pain. Plaintiff reported that in the past, Vicodin had been prescribed and

had provided relief. After she was advised to stop the Hydrocodone [1], she was prescribed Ultram, Naproxen and Indocin but she chose to discontinue NSAIDs and treat herself with Vicodin which she obtained from a family member. The doctor noted that Plaintiff missed two appointments at the University, one in October 2006 and the other in January 2007. Tr. at 304. On physical examination, Plaintiff's lower thoracic spine was tender to touch. Several trigger points were noted to the right quadrantus muscle area. Plaintiff was tender to palpation over the right trochanteric bursa. Range of motion was fairly normal. Straight leg raising was positive on the right, negative on the left. The doctor noted spinal canal stenosis on the MRI at C5–6. Tr. at 305. Plaintiff was counseled to quit, or cut down, smoking. She was advised against using Vicodin that is not prescribed. She was offered a prescription for Tramadol and/or NSAIDs but she was not interested. Tr. at 306.

On January 16, 2008, Plaintiff was seen at the primary care clinic of the University of Iowa. Plaintiff complained of chronic back pain and asked for narcotic medication. She said previous work-ups had only resulted in her being told she has degenerative joint disease. Plaintiff also asked for some assistance to stop smoking because of the Raynaud's phenomena. She reported smoking 2 packs per day for 37 years. On physical examination, Plaintiff was described as a well-nourished woman who had a slight cough, but no other gross abnormalities. Plaintiff was counseled about using chronic narcotics. She was willing to accept a prescription of trazodone instead. She was also given a prescription of Chantix to help her stop smoking. Tr. at 308.

When Plaintiff was seen at the University on March 5, 2008, she was not getting relief from the medication, so the doctor increased the dosage. Tr. at 311.

On April 10, 2008, Plaintiff reported that she stopped taking Zoloft, which had been prescribed, because it was causing nightmares. It was explained to Plaintiff that nightmares often occurred when one was recovering from depression. Plaintiff did not want to take antidepressants, so the medication was discontinued. Tr. at 314.

## ADMINISTRATIVE HEARING

At the hearing, in response to a question about her past work, Plaintiff testified that her past work had consisted of heavy labor machine operator jobs until, at the end, she did some home care for "an elderly gentleman in my home and then my brother broke his neck and I helped take care of him." Tr. at 28. She said she stopped working in February 2006 because her arms, back and legs were so painful she couldn't do things such as clean the bathtub or cook for her brother. During that time, she said that she also took care of her mother.

Regarding her hands, Plaintiff testified that pain from her shoulder causes the fingers to go numb and hurt, making them unusable. Tr. at 29. In addition, she said that she has carpal tunnel syndrome which also makes her hands hurt. She said that both hands hurt, but the right hand is worse. Tr. at 30

Plaintiff testified that she has pain in her upper back, across her shoulders, down her arm and elbow, the wrists and joints of her hands. She has pain in her

---

1. Vicodin is hydrocodone bitartrate and acetaminophen. Physicians' Desk Reference,

2010 PDR 0040–7310.

mid back and low back. Tr. at 31. "And then my lower back, it hurts really bad on both sides like a sharp pain and it goes across both hips and then it goes down my legs and my knees have sharp pains in them. And then my feet, they don't really have sharp pains but they sting and burn all the time. It just, it's everywhere." Tr. at 31–32. Plaintiff said she has a neck brace which she finds helpful when she has headaches because it takes the weight of her head off her shoulders and neck. Tr. at 32.

Plaintiff said that the medication prescribed—Tramadol—gives her very little relief, and makes her tired after the second dose. Tr. at 33–34. She testified that her pain makes it very difficult to sleep. The doctors gave her some antidepressants to help here sleep, but they made her so groggy she couldn't take them. "And I couldn't wake up to put wood on the stove and when I'd get up in the morning, I just felt like I was drunk or something." Tr. at 34. Plaintiff admitted taking hydrocodone prescribed for "a family member" to relieve her pain. She said the doctors had warned her that taking narcotic medication for chronic pain was not good for her, but "sometimes I just can't function if I don't take something." Tr. at 35. She said that alternating her positions is also helpful: "Sometimes I have to lay down. Sometimes I have to sit. I'll switch from one chair, you know, my kitchen chair to my living room chair to the couch. I just, I constantly move around to try to move the pain around. It doesn't really get rid of it." She said she can sit for about a half hour before needing to move, and can stand for about 15 minutes. Tr. at 36. She said that after a 30 or 45 minute trip to the grocery store, she needs to lay down. She said that lifting a gallon of milk causes a sharp pain in her right arm and elbow. Plaintiff was asked about her ability to do household chores and she testified:

> I have a hard time ... I got concrete floors and ... I push this dust mop and I'm not too bad with that if I just do one room at a time but when I have to mop it, it's really hard to mop it. I may do part of it, and later on ... do it a little bit more. And I guess the other thing is I've got the wood burner, I've got a couple guys that stay with me and help pay the bills at the house and one of the guys brings in most of the wood but they work at nighttime and in the daytime if he hasn't brought it, sometimes I have to go out and bring the wood in and I do that probably three or four times a day. I'll bring in a piece of wood at a time and that makes my arm and my shoulders and neck stuff hurt.

Tr. at 37.

Plaintiff said she can drive short distances, but when she needs to go from her home to Iowa City to see her doctors, her mother helps her drive because of the pain in her legs. She said that the pain in her hands sometimes makes it difficult to turn the key in the ignition. Tr. at 38. She told the ALJ that she can write for 5 or 10 minutes at a time, and that zippers and buttons are difficult as well. "Sometimes I need both hands to hold my cup of coffee." Tr. at 39.

Plaintiff testified that she smokes as much as 2 packs of cigarettes per day. She said she would like to quit, but has been unable to in spite of advice from the doctors to do so. Tr. at 40. Plaintiff said that she doesn't use any alcohol or non-prescribed drugs other than the hydrocodone. Tr. at 41.

In response to a question about why she cannot work for 8 hours per day, Plaintiff responded: "Pain." The ALJ asked Plaintiff if she lies down during the day. Plaintiff responded: "I try to take a nap in the

afternoon. When I get to hurting, I try to lay down, get some sleep because I get tired. But like if I go to the grocery store or if I go out to visit my mom or my brother, when I get back I usually hurt and then I lay down for half an hour to an hour and, you know, some of the pain subsides but it never goes away."

After Plaintiff testified, the ALJ called Elizabeth Albrecht to testify as a vocational expert. Tr. at 42. For the first hypothetical question the ALJ asked the vocational expert to consider a person who could perform light work as defined in 20 C.F.R. § 404.1567(b), except that the individual would occasionally be able to bend, stoop, crawl, kneel and able to do frequent handling and fingering bilaterally, but unable to work in cold environments or around vibrations. In response, the vocational expert testified that Plaintiff's past jobs of housekeeper and plastic press mold could be done. Tr. at 45. Regarding the job of plastic press mold operator, Plaintiff interjected: "No, there's absolutely no way I can do that." The vocational expert identified other unskilled light jobs such as "assembler, small products I," "marker," and "cleaner, housekeeping." Tr. at 46.

The second hypothetical again limited lifting to 20 pounds occasionally and lesser weights occasionally. The ALJ said that under this hypothetical, there would be no lifting on a frequent basis, and only occasional use of the hands for reaching, fingering, and handling. Walking was limited to 200 feet once an hour. The vocational expert testified that the limitation on lifting would put the individual into the sedentary range, and that the limitation on the use of hands would preclude all unskilled work. Tr. at 47. At the conclusion of the hearing, Plaintiff asked the ALJ if the jobs identified by the vocational expert were full time. The ALJ told her yes, and Plaintiff said the following:

There's absolutely no way that I could do those jobs. I had to quit a job working for my mom which was only two to three hours a day because of the pain that I experience in my back and my neck and my legs and as I do things, just mopping my floor at the house or cooking or trying to clean my tub or bring in my wood, just the simple little things that I have to do, I can't do those eight hours a day. I can just do them periodically because every time I do something, it increases the pain. When I get up in the morning, I take my pain medicine to loosen me up and get me moving because I'm stiff and I have sharp pains in the morning. And that takes about an hour and a half to two hours for that to start working before I even start getting ready to do anything, get myself dressed and feed myself. And then after I do that, I'm wore out just from dressing and sometimes take a bath. I use to take a bath every day but I only take a bath probably once a week now, or like if I have to go somewhere, because it's such a struggle and it wears me out. I just get exhausted and the pain just increases as I do things. And that's what the problem is.... No matter what I do—the more I use my hands or I walk or I stand or I sit, the pain just increases and gets worse and worse and by the time 2:00 in the afternoon has come, I'm usually done. I hurt so bad that I can't, I try to schedule myself according to how the pain affects me and at home, I've been dealing with it for going on three years now and so I know what I can do and what I can't do and there's no way I could work eight hours a day.... I think they only give you a morning break, a lunch break, and an afternoon. And by the time lunch came, I'd be going home. And if I worked, I exert myself one day, then the next couple of days I pay dearly for it and it

causes me pain. Sometimes I don't even get out of bed when I do something. Tr. at 48–49.

## ADMINISTRATIVE DECISION

In reaching her finding of residual functional capacity, the ALJ wrote: "In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence ..." Tr. at 15. The ALJ wrote:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Tr. at 16. The ALJ noted that none of Plaintiff's treating physicians had placed any work restriction on her and that Plaintiff failed to follow her doctor's advice to stop smoking. The ALJ also noted Plaintiff's use of non-prescribed hydrocodone. The ALJ discussed the consultative examination by Dr. Mineart, but gave the report little weight because the doctor was given no medical history to review before the one time examination. Tr. at 16. Although the ALJ acknowledged that Plaintiff's daily activities were limited:

> ... two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute the degree of

limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

Tr. at 17. The ALJ gave weight to the opinions of the doctors at Disability Determination Services, even though they did not examine Plaintiff, because they were consistent with each other and with the ALJ's view of the evidence. Tr. at 18.

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008) (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

*Owen v. Astrue,* 551 F.3d 792, 798 (8th Cir.2008.) In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

Plaintiff makes two arguments. First that the ALJ's finding of residual functional capacity is not supported by substantial evidence on the record as a whole. Second, that the ALJ improperly discredited Plaintiff's testimony. Because of these alleged errors, and because of the testimony of the vocational expert, Plaintiff urges the Court to reverse and award benefits.

Defendant, on the other hand, argues that Plaintiff did not carry her burden to prove that she is unable to do her past relevant work, and that the ALJ's credibility finding does pass muster under the law and regulations. The Commissioner urges the Court to affirm his final decision.

█ In *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc), the Court wrote: "Probably the most important issue will be the question of RFC ..." The Court went on: "The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." While an ALJ is charged with determining a residual functional capacity based on all the evidence, it is a medical question and must be supported by some medical evidence. *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir.2001). Additionally, a credibility finding cannot substitute for medical evidence to support a finding that a claimant has a residual functional capacity to work. *Soth v. Shalala,* 827 F.Supp. 1415, 1417 (S.D.Iowa 1993).

█ As stated above, both parties brief the issue of the ALJ's credibility finding. In making her residual functional capacity determination, the ALJ attempted to discredit Plaintiff's testimony by writing: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." As the Seventh Circuit recently observed:

> The administrative law judge's opinion states that "after considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." This is a piece of boilerplate that appears in virtually identical language in both these cases as well as in a third social security case argued to us the same day. It is not only boilerplate; it is meaningless boilerplate. The statement by a trier of fact that a witness's testimony is "not entirely credible" yields no clue to what weight the trier of fact gave the testimony.

*Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir.2010).

The ALJ's credibility finding fails to pass muster under Eighth Circuit case law as well, and under the agreement reached in *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984), wherein it is written:

> While the claimant has the burden of proving that the disability results from a

medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not support them. The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

1.   the claimant's daily activities;
2.   the duration, frequency and intensity of the pain;
3.   precipitating and aggravating factors;
4.   dosage, effectiveness and side effects of medication;
5.   functional restrictions.

The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.]

In the case at bar, the ALJ wrote that Plaintiff's subjective complaints were credible only to "... the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence ..." Plaintiff came forward with more than adequate objective medical evidence of a severe impairment. X-rays and MRIs at the University of Iowa Hospitals and Clinics show that Plaintiff has degenerative disease from her cervical to sacroiliac spine. EMG studies show that she has bilateral carpal tunnel syndrome. None of the doctors suggested the complaints were out of proportion to the objective medical evidence. This, in itself, is objective evidence supporting her credibility. *O'Donnell v. Barnhart,* 318 F.3d 811, 817 (8th Cir.2003), citing *Cox v. Apfel,* 160 F.3d 1203 (8th Cir.1998). Plaintiff more than adequately met her burden on this score, and the ALJ, using boilerplate language, acknowledges as much: "... after considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms ..."

ALJs are not charged with judging the credibility of a claimant's daily activities. They are charged with judging a claimant's credibility based on "... full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as [among other things] the claimant's daily activities ..." Here, the ALJ's analysis misses the mark because, rather than search the record before her "... observations by third parties and treating and examining physicians relating to such matters as ... daily activities," she discusses why she does not believe the daily activities testified to by Plaintiff are evidence of disability. The ALJ's misgivings about Plaintiff's daily activities, as well as the other factors for which "observations by third parties and treating and examining physicians" are sought, are irrelevant to a proper analysis of a claimant's credibility. There are no observations by third parties or treating or examining physicians which would indicate Plaintiff's daily activities are not exactly as she testified or

because of her pain. It must be remembered that the only reason Plaintiff sought medical care at the University of Iowa was because the pain caused by the degeneration in her spine, as well as the carpal tunnel syndrome, had become so severe that she could no longer work.

The ALJ observed that none of Plaintiff's doctors had given her any work restrictions. However, with the exception of the first visit to the University of Iowa in January 2006, Plaintiff had already stopped working and during the pendency of the claim before the Commissioner, none of the doctors was asked for an opinion regarding her residual functional capacity. Plaintiff did not have an attorney until after the hearing. An ALJ has a duty to fully and fairly develop the record even if the claimant is represented. "This Court has consistently held that the ALJ must fully and fairly develop the record so that a just determination of disability may be made." *McCoy v. Schweiker*, 683 F.2d at 1147.

The doctors observed that Plaintiff's prescribed medication provide only modest relief. Stronger medication, while helpful to her, is not medically advisable because of the chronic nature of the pain.

Plaintiff's work record—something which the ALJ is charged with considering—shows that when she was able to work, she did so (Tr. at 107), often doing very heavy, heavy and medium type work (Tr. at 226).

The Court agrees with Plaintiff that the ALJ's finding that Plaintiff has a residual functional capacity is not supported by substantial evidence on the record as a whole. Likewise, the Court agrees that the credibility finding is not supported by substantial evidence on the record as a whole.

## REMEDY

Plaintiff argues that the Court should remand this case along with an order to award benefits. The ALJ stopped the sequential evaluation at the 4th step, finding that Plaintiff retains the residual functional capacity to return to her past relevant work. This finding was based on a hypothetical question posed to the vocational expert which assumed that the claimant could do light work, limited only by the need to avoid cold environments and vibrations. The hypothetical emphasized that Plaintiff is able to frequently handle objects and use her fingers.

Like the ALJ's credibility finding, the hypothetical does not pass muster under Eighth Circuit case law. To do so, a hypothetical question must precisely set out the claimant's particular physical and mental impairments. *Tennant v. Schweiker*, 682 F.2d 707, 711 (8th Cir.1982).

In this case, the ALJ could have, and should have, obtained testimony from one of Plaintiff's treating physicians at the University of Iowa regarding her ability to function in a workplace. Absent that, an examination by a physician who reviewed the medical records that were before the ALJ could have easily been arranged before a decision was made. Since neither of these alternatives took place, we are left with the report submitted by Dr. Mineart. While it is true that his evaluation is deficient in that he did not have access to the medical records, he did examine Plaintiff, and he observed that she was unable to work where repetitive lifting or repetitive motions of the hands were involved. The ALJ wrote that she gave more weight to the opinions of the doctors at Disability Determination Services who evaluated the claim at the initial and reconsideration stages of the process. The opinions of the physicians at Disability Determination Services, on the other hand, "do not constitute

substantial evidence on the record as a whole." *Brock v. Secretary of Health & Human Services,* 791 F.2d 112, 114 (8th Cir.1986); *see also, Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir.2010) ("The opinions of a [non-treating, non-examining] physician 'do not normally constitute substantial evidence on the record as a whole.' *Shontos v. Barnhart,* 328 F.3d 418, 427 (8th Cir.2003).") The difficulty of using her hands and fingers is supported not only by Plaintiff's testimony, and by Dr. Mineart, but also by the observations of her treating doctors at the University of Iowa as noted in the fact section of this Opinion.

When the vocational expert realized that the ALJ's second hypothetical restricted the use of the hands and fingers, she testified that all work is precluded. The vocational expert testified that the inability to engage in frequent lifting would take the claimant from the light category down to the sedentary. With the inability to use the fingers and hands frequently, no work is possible. Tr. at 47.

In *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987), the Court held:

> Ordinarily, where the Secretary has incorrectly allocated the burden of proof based upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

Likewise in the case at bar, the record is sufficiently developed that Plaintiff has proven her claim and a remand for additional testimony is unnecessary.

## CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D. Arkansas 1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The final decision of the Commissioner is reversed and the Commissioner is ordered to award Plaintiff the benefits to which she is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[2]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa July 15, 2005).

IT IS SO ORDERED.

---

**2.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."